UNITED STATE DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------------x
NORTHWELL HEALTH, INC.,

                    Plaintiff,

        -against-                                          Case No. 2:26-cv-00845-NJC-LGD

BLUE CROSS AND BLUE SHIELD OF               **COMPLAINT**
MINNESOTA, BLUECROSS BLUESHIELD
OF MINNESOTA, and BCBSM, INC.,

                    Defendant.
------------------------------------------------------------x

        Plaintiff Northwell Health, Inc. ("Northwell"), by and through its attorneys, Butler

Tibbetts, LLC, as and for its Complaint, alleges as follows:

**PARTIES**

        1.      Northwell is a New York not-for-profit corporation that operates hospitals and

health care facilities that provide health care services to the public. Northwell's principal place is

located at 2000 Marcus Avenue, New Hyde Park, New York 11042. Northwell brings this

lawsuit on its own behalf and on behalf of each of the hospitals and health care facilities, in the

Northwell health system.

        2.      Defendants Blue Cross and Blue Shield of Minnesota, BlueCross BlueShield of

Minnesota, and BCBSM, Inc. (collectively, "Defendant"), are out-of-state not-for-profit

corporation organized and existing pursuant to the laws of the Minnesota with its principal place

of business located in Egan, Minnesota. Defendant issues and/or administers healthcare

insurance plans which cover healthcare services provided by hospitals and physicians to patients

insured under those plans. Defendant pays, or reimburses, part or all of the healthcare provider's

charges for those healthcare services. Defendant at all relevant times has transacted business in

1

the State of New York, including but not limited to the transaction of business which is directly related to, and gives rise to the claims herein.

## JURISDICTION AND VENUE

3. This action was originally commenced by Plaintiff in the Supreme Court of New York in the County of Nassau. Defendant removed the action to this Court on February 13, 2026, asserting that removal was proper under 28 U.S.C. §1332 because of the diversity of citizenship of Northwell and Defendant. Federal diversity jurisdiction exists because Plaintiff is a New York not-for-profit corporation with its principal place of business in New York State and Defendant is an insurance corporation that is organized and existing pursuant to the laws of the State of Minnesota and maintains its principal basis of business in that State.

4. Venue in the Eastern District of New York is proper pursuant to 28 U.S.C. §1391 because a substantial part of the events or omissions that are the basis for the claims asserted herein occurred and/or are based in this District.

## NATURE OF ACTION

5. Northwell brings this action against the Defendant for damages arising from the Defendant's failure to timely and fully pay the amounts due to Northwell, or ensure that Northwell was properly paid, for the healthcare services Northwell provided to Defendant's insureds or plan members during the period from March 7, 2019 through December 31, 2024, and continuing ("the relevant period").

6. Northwell seeks to recover such damages under the applicable terms of the pertinent contracts that (1) required Northwell to provide such healthcare services and set the amount due for such services, and (2) bind Defendant to all the applicable terms of those

2

contracts, including the obligation to pay Northwell the amount due for the healthcare provided to patients insured by Defendant's healthcare plans.

## FACTUAL BACKGROUND

7. Defendant is a member of the of the Blue Cross and Blue Shield Association ("BCBSA").

8. The BCBSA was created by Blue Cross Blue Shield companies, such as Defendant, operating throughout the country ("Member Companies").

9. In 1992, the BCBSA Member Companies established the national "BlueCard Program" which ensures that (i) a Member Company in one geographical area could receive access to the healthcare services of an in-network provider of the geographic area of another Member Company, and (ii) that, when a person insured by a Member Company is treated by an in-network provider of another Member Company, then the Member Company insuring the patient would pay the provider in accordance with the rates and other terms of the provider's in-network agreement with the local Member Company located where the patient was treated.[1]

10. The BCBSA website lists the names, and geographical areas served by, each of the Member Companies.

11. Defendant is included in that list and Defendant's exclusive geographical area is Minnesota.

12. Member Companies, including Defendant, or its agent or affiliate, issue health plans that are part of the national "BlueCard" Program ("BlueCard Plans").

---

[1] Upon information and belief, there may exist similarly situated and structured National programs and plans with the same obligations as the BlueCard Plan, such as the BCBSA National Accounts Program, to the extent such programs and plans exists and cover patient claims at issue in this lawsuit, for the purpose of this pleading, the terms BlueCard Program and BlueCard Plans shall encompass all similarly situated and structured programs and plans.

13.    Since 1995, it has been a requirement of the BCBSA Licensing Agreements, as agreed by the Member Companies, that all Member Companies' plans be BlueCard Plans.

14.    Empire Blue Cross and Blue Shield now known as Anthem Blue Cross and Blue Shield (hereinafter, "Empire") is also included in the list; Empire's exclusive geographical area includes the New York counties where Northwell's healthcare facilities are located.

15.    During the period between 1995 and the end of 1999, Northwell's predecessors (North Shore Health System and Long Island Jewish Hospital) rendered healthcare hospital services to patients insured by out-of-state BlueCard Plans, including Defendant.

16.    During that same time period (1995-1999), Empire engaged in conduct, exhibiting that Empire had agreed with the other Member Companies, including Defendant, to act on their behalf by insisting that Northwell treat patients insured by other Member Companies' BlueCard Plans and by assisting in the processing and payment of claims for services rendered by Northwell to patients insured by other Member Companies' BlueCard Plans.

17.    Similarly, during that same time period (1995-1999), through its acquiescence and participation in the payment process, Defendant demonstrated to Northwell's predecessors that it authorized Empire to act on its behalf.

18.    On or about January 1, 2000, Northwell, on behalf of itself and its affiliated hospitals and facilities, entered into (i) a Participating Hospital HMO Agreement with Empire Blue Cross and Empire HMO, and their affiliates, and (ii) a Participating Hospital PPO/Indemnity Agreement with Empire Blue Cross and Empire Assurance, and their affiliates (collectively, "2000 Provider Agreement").

19.    Since January 1, 2000, Northwell and Empire have agreed to multiple amendments to the 2000 Provider Agreement, including amendments which have extended the

scope of the 2000 Provider Agreement to include most, if not all, of Empire's insurance products (collectively, these agreements and amendments are referred to as the "Provider Agreement").

20.    Among other things, the Provider Agreement establishes that the Northwell Health system is a participating, or in-network, provider in the health insurance plans issued or managed by Empire or any of its affiliates and the BlueCard plans.

21.    Since at least January 1, 2000 and continuing to date, Northwell has rendered healthcare services to patients insured by BlueCard Plans issued or administered by Defendant, or its agent or affiliate. These medical services were processed and paid consistent with the methodology set forth below in paragraph 85 (identified as the "BlueCard Payment Process") and further outlined in paragraphs 105-121. The majority of the payments for these claims were consistent with the in-network rates and terms in the Provider Agreement and Defendant never repudiated that it is bound to by the Provider Agreement.

22.    On various dates of service during the relevant period, Northwell provided medically necessary services, supplies and/or equipment to certain identified patients insured by BlueCard Plans issued or administered by Defendant, or its agent or affiliate.

23.    Defendant issued to each of its insureds identification cards identifying their health insurance plans as BlueCard Plans (the "ID card"), providing national healthcare coverage.

24.    Defendant instructed all of its insureds to present the ID card to healthcare medical providers (including Northwell) to obtain medical care, which was then provided.

25.    Defendant issued the ID card with the knowledge and intent that any participating provider of any other Member Company would be assured that payment for such services would be made by Defendant.

26.     Defendant identified Northwell facilities on its patient portal and/or its list of in-network providers as being in-network facilities under its BlueCard Plans.

27.     The ID cards presented by Defendant's insureds to Northwell allowed Northwell to identify that they were insured by BlueCard Plans issued by Defendant, or its agent or affiliate.

28.     When necessary, after being presented the ID cards, Northwell contacted Defendant through the phone numbers or other contact method published on the ID cards to obtain prior authorizations for the services to be provided to Defendant's insureds.

29.     For some of the patients who received healthcare services from Northwell during the relevant period that were insured by Defendant, Defendant failed to properly pay Northwell for those healthcare services. Northwell has identified these patients (the "Patients") and claims at issue herein by providing Defendant, prior to or contemporaneously with filing of this Complaint, an updated chart or charts showing the patient names and other details, such as dates of service, claim numbers, claim amounts and claim payments, if any (the "Claims").[2]

30.     Those individuals insured by Defendant's plans who received healthcare services from Northwell during the relevant period who are not identified on the chart(s) were submitted by Northwell for payment and paid in accordance with the terms of the Provider Agreement.

31.     The Claims at issue were either underpaid or improperly denied.

32.     More often than not for claims submitted to Defendant during the relevant period, Defendant processed and paid claims at the proper, in-network rates.

33.     All of the Claims at issue are facility-based claims and none are claims for physician services.

---

[2] Northwell has limited disclosure of patient identification data here pursuant to the privacy provisions of the Health Insurance Portability & Accountability Act ("HIPPA"), 42 U.S.C. §§ 1320 *et seq.*

**The BCBSA & BlueCard Program**

34.     The Member Companies created and have full control of the BCBSA.

35.     The BCBSA Board of Directors is comprised of the CEOs of each of the Member Companies and the CEO of the BCBSA.

36.     Together as voting members of the Board of Directors, the Member Companies annually elect, by a majority vote, the CEO/President of the BCBSA and they may similarly, remove the CEO/President by a majority vote.

37.     Together as voting members of the Board of Directors, the Member Companies create and approve the bylaws for the BCBSA and similarly, may amend or repeal the bylaws and adopt new bylaws.

38.     The Member Companies annually fund the BCBSA with more than one-half of a billion dollars in fees based upon each Member Company's pro rata percentage share of the premiums received annually.

39.     The CEOs of the Member Companies have fiduciary responsibilities to both their own Member Company and the BCBSA.

40.     Together as voting members of the Board of Directors, the Member Companies created and adopted certain agreements that create mutually agreed upon "Member Standards", "Member Guidelines", and other agreed upon rules and regulations, "Members' Agreed Rules" for the Member Companies. The Member Companies may amend or repeal these agreements or adopt new agreements.

41.     Some, but not all, of the agreements and obligations are set forth in the BCBSA License Agreements and in documents referenced therein or attached thereto (i.e., the Inter-Plan Programs Policies and Provisions ("IPPPP") and Inter-Plan Medicare Advantage Program Policies and Provisions).

7

42.     Each Member Company, including Defendant and Empire, executed a License Agreement with the BCBSA.

43.     Defendant and Empire agreed in the Member License Agreement that they would "(a) to maintain in good standing their membership in BCBSA"; [and] "(d) to comply with the Membership Standards".

44.     Each controlled entity of a Member Company signs a form Controlled Affiliate Licensee Agreement with the BCBSA in which each Controlled Affiliate of a Member Company agrees that it is "bound by the standards regarding quality control shown in the attached Exhibit A as they may be amended by BCBSA from time to time."

45.     Publicly available information regarding the Member Companies and the BlueCard Program shows that (i) the CEOs of the Member Companies have control over the terms of the BlueCard Program; (ii) training materials for the CEOs of the Member Companies inform that they have authority to establish or change the constitutional framework or any matter that affects fundamental aspects of the BlueCard System; (iii) the Member Companies control the terms of each Member Company's License Agreement, and (iv) the CEOs possess the authority to amend or add regulations regarding the BlueCard Program.

46.     While the Licensing Agreement may state that "nothing contained herein shall be construed to constitute the parties hereto (*i.e.*, BCBSA and Defendant here) as partners or joint venturers, or either as the agent of the other[.]" The Licensing Agreement *does not* state that one Member Company is not, nor can never be, an agent for another Member Company.

47.     The Member Companies require that Defendant (in Minnesota) and Empire (in New York State), adhere to the Membership Standard, *inter alia*, that they:

> shall effectively and efficiently participate in each national program
> as from time to time may be adopted by the Member Plans for the

8

purposes of providing portability of membership between the Plans and ease of claims processing for customers receiving benefits outside of the Plan's Service Area.

Such programs are applicable to Blue Cross and Blue Shield Plans, and include: . . . B. BlueCard Program; . . . [.]

48.    The Member Companies also require that Defendant and Empire take such action as required to ensure its financial performance in programs and contracts of an inter-Plan nature, such as the BlueCard Program.

49.    The Licensing Standard adopted by the Member Companies requires each Member Company's participation in the BlueCard Program.

50.    According to the BCBSA website, the BlueCard Program:

"links participating healthcare providers and the [thirty-three] independent Blue Cross Blue Shield companies across the country in a single electronic network for claims processing and reimbursement."

51.    In connection with their objectives in creating the BlueCard Program, the Member Companies agreed, by and among themselves, to certain BlueCard Program rules contained in BCBSA documents such as the Inter-Plan Programs, Policies, and Provisions and other non-public agreements, that are incorporated by reference into their Licensing Agreements.

52.    Included in these BlueCard Program rules and/or related agreements of the Member Companies are certain obligations that run from the Member Companies to in-network providers of other Member Companies who perform medical services on Patients insured by the non-local Member Company (the "Home Plan"), here Defendant.

53.    All Member Companies agreed and required that each Member Company include in its contracts with its local in-network providers contract terms that would make their local providers' in-network services, contractual terms, and discounted rates available to all other Member Companies.

9

54.     All Member Companies, including Defendant, communicated to all healthcare providers, including Northwell, via direct correspondence, press releases, their websites, marketing, advertisements, and actions: (i) the existence of the BlueCard program; (ii) how the BlueCard program works; (iii) that only the Member Company in each provider's GEO-Region would be negotiating provider agreements with the healthcare provider; (iv) that the Member Companies would be negotiating the terms of their respective provider agreements on behalf of itself and all other Member Companies; and that (v) all of the Member Companies authorized the negotiation of such provider agreements and terms on their behalf.

55.     When a patient of one Member Company is treated by an in-network provider of another Member Company, these two companies are involved in administering the BlueCard claims process: (i) the "Home Plan" which is the Member Company that gains access to the in-network services and rates of a provider operating outside that Member Company's geographical region (here, Defendant) and (ii) the "Host Plan" which is the Member Company that is located in the geographical region where the treatment is provided, and which has an in-network agreement with the local provider who treats patients insured by the Home Plan (here, Empire).

56.     Each Member Company agreed that when a Host Member Company's contracted provider treats a patient covered by a Home Member Company's Plan, then that Home Member Company's Plan will reimburse the provider in accordance with the provider's in-network contract with the local Host Member Company.

57.     In order to meet the BlueCard Program objectives, the Member Companies agreed to obligate themselves to negotiate with their in-network local providers BlueCard terms that extend the network providers services, rates, and terms to the Home Member Companies in

10

exchange for the promise that the Home Member Companies would pay for such services in accordance with the rates and terms in the provider agreements with the Host Members.

58.     Here, the specific contract language that links Northwell and Defendant, are certain BlueCard related provisions that Empire, on behalf of Defendant, included in the Provider Agreement, including that Defendant as the "Payer", as defined in the Provider Agreement is bound by all rate and terms.

**BlueCard Provisions in the Provider Agreement**.

59.     The Provider Agreement sets forth the rates and terms by which Northwell is to be paid for the health care services provided to patients insured by Empire and BlueCard plans and other contractual rights and obligations of the parties.

60.     The Member Companies agreed that they would not negotiate in-network agreements with healthcare providers in service areas of other Member Companies. Therefore, Defendant and the other Member Companies relied upon Empire to negotiate with Northwell.

61.     The Member Companies, including Defendant, entered into various agreements by and among themselves that outline and manifest their intention that other Member Companies, here Empire, are authorized to act on their behalf to include in their in-network agreements with providers, here Northwell, terms ensuring all of the Member Companies have access to in-network services, rates, and terms of the Provider Agreement.

62.     Pursuant to Defendant's aforementioned authorization, Empire included in the Provider Agreement BlueCard Program provisions which conform to Empire's obligations under the agreements among the Member Companies.

63.     Examples of such BlueCard Program provisions include: (i) that Northwell accept subscribers of Member Companies or their affiliates or subsidiaries as patients; (ii) that

11

Defendant pay the contracted rates for services rendered to patients insured under its plans using Empire as its conduit; and (iii) that Defendant will be bound to all terms of the Provider Agreement.

64.     As intended by the Member Companies in their agreements by and among themselves, the Provider Agreement ensures Defendant and its BlueCard Plans have access to Northwell's in-network services, rates, and terms.

65.     Empire's role in making payment to Northwell for services rendered to Defendant's insureds depends entirely on the actions of Defendant.

66.     Empire can only make a payment to Northwell when Empire receives both (i) Defendant's specific, unconditional, and unalterable authorization and direction to pay Northwell, and (ii) Defendant promised that it would pay Empire, near simultaneously, through a centralized payment process, the amount of any authorized payment Empire made to Northwell at the direction, and on behalf, of Defendant.

67.     In negotiating and agreeing to the terms and language in the Provider Agreement, Empire, on its own behalf and on behalf of Defendant and the other Member Companies, intended that the language "reimbursed by Empire" for services rendered to Other BlueCard Plan patients means Empire's payment only occurs after it received Defendant's authorization and direction to make said payment, and near simultaneous reimbursement of said payment from Defendant to Empire.

68.     The Provider Agreement was substantially rewritten in an amendment signed November 9, 2007, and effective as of January 1, 2008 (the "2008 Amendment"). Where inconsistencies arise, the 2008 Amendment modifies and supersedes the terms of the underlying 2000 base agreement.

69.     Among many other things, the BlueCard terms were rewritten by Northwell and Empire, on its own behalf and as agent for Defendant and all Member Companies, to reiterate and make explicit that Empire was not the entity responsible to pay Northwell for services provided to patients insured by Other BlueCard Plans.

70.     Under agreements among the Member Companies, the Home Plan is obligated to pay Northwell, and a payment structure was implemented in the BlueCard Program to ensure that Empire receive reimbursement of any authorized payment made on behalf of other Member Companies by Empire to Northwell.

71.     Art. III(h) of the 2008 Amendment sets forth that a Member Company, here Defendant is the 'Payer" of a claim for services rendered to their insureds "with respect to any such Blue Card Plans' fully insured business".

72.     With that language, Empire on behalf of Defendant and the other Member Companies identified and specified that the BlueCard entity that insures a patient treated by Northwell is the "Payer" as defined in the Provider Agreement.

73.     Empire, which does not insure any of the Patients at issue in this suit, is not a "Payer," as that term is defined, for the claims at issue herein.

74.     Pursuant to Art. III(h) of the 2008 Amendment, there is no circumstance wherein Empire is the "Payer" obligated to pay for services rendered to patients insured by non-Empire plans.

75.     The Provider Agreement, specifically in the 2008 Amendment, uses the defined term "Payer" to set forth at least two substantive BlueCard Program terms to link Northwell with the non-Empire Member Companies.

76.    Art. III(h) in the 2008 Amendment states that "All Payers shall be entitled to access the services of [Northwell] providers that participate in the Empire network."

77.    This term creates a partial assignment from Empire to Defendant's BlueCard Plans of Empire's contractual right to access Northwell's in-network services, rates, and terms.

78.    Defendant manifested its intention to accept that assignment both before and after Empire signed the 2008 Amendment by repeatedly accepting the contractual benefits of Northwell's in-network services, rates, and terms whenever Northwell treated a patient insured by Defendant.

79.    Through the agreements the Member Companies reached by and between themselves, the Defendant expected and manifested its intention, that Empire include terms in any in-network provider agreement (including the Provider Agreement with Northwell) to provide Defendant access to the in-network services, rates, and terms and to bind Defendant to the provider agreement's rates and terms.

80.    Art III(g)(b) of the 2008 Amendment clarifies that the access any Payer, such as Defendant, has to Northwell's in-network services, rates, and terms is subject to that Payer being "bound by the applicable rates and all other applicable terms of this Agreement," which includes the obligation that Defendant pay for such services.

81.    This language is consistent with agreements among the Member Companies and its inclusion into the Provider Agreement by Empire, manifests an intention by Empire that the Provider Agreement comports with the agreements of the Member Companies and that Defendant, the recipient of contractual access to Northwell's in-network services, rates and terms, be contractually bound to pay those in-network rates to Northwell in accordance with the terms of the Provider Agreement.

82.    These BlueCard terms in the Provider Agreement comport with the objectives of the BlueCard Program and the Member Companies in their agreements by and among themselves that (i) each Member Company make their local provider discounts available to all other Member Companies and (ii) each Home Member Company reimburse a provider that treats a patient insured by it and has an in-network provider agreement with the local Home Member Company at a rate which equals that set forth in that provider's in-network agreement.

83.    Absent such BlueCard terms in the Provider Agreement, the Member Companies would not have the "links" that they required between the Home Member Companies and "participating health care providers" of the Host Member Company, such as Empire, in the program's "national network."

**The BlueCard Payment Structure**

84.    Prior to the negotiation and execution of the 2008 Amendment, the BCBSA companies agreed among themselves and obligated themselves to a payment structure when an in-network provider of a Member Company treats a patient insured by another Member Company.

85.    The payment structure and process is as follows: (i) the provider submits a claim to the Host Plan; (ii) the Host Plan prices the claim and forwards it to the Home Plan; (iii) the Home Plan makes coverage determinations and applies patient cost sharing to the claim (the "claim and payment determination"); (iv) the Home Plan forwards its claim and payment determination to the Host Plan; (v) the Home Plan authorizes and directs the Host Plan to pay the provider the amount set forth in the claim and payment determination; and (vi) when the Host Plan makes payment to the provider as directed and authorized by the Home Plan, then through a

centralized bank process, the Host Plan is near simultaneously reimbursed by the Home Plan (the "BlueCard Payment Process").

86.     The role of the Host Plan (here, Empire) in the BlueCard Payment Process is ministerial and is performed solely in its capacity as the Home Plan's (here, Defendant's) claims processing agent. The Home Plan (here, Defendant) is in control of the Host Plan's (here, Empire's) actions in the BlueCard Payment Process.

87.     The Home Plan (Defendant), not the Host Plan, is always the entity with the liability to pay the provider, which liability arises under the terms of the Host Plan's (Empire's) in-network agreement with the provider (here, Northwell) as well as agreements among the Member Companies.

88.     During negotiations of the BlueCard terms in the Provider Agreement, Empire, Defendant, and Northwell were all familiar with the BlueCard Payment Process.

89.     The BlueCard terms manifest an intention that payments made by Empire to Northwell for treating a patient insured by another BlueCard Plan are solely made in its capacity as a claims processing agent of that other BlueCard Plan (here, Defendant).

90.     The Home Plan (here, Defendant) remains liable to the local in-network provider (here, Northwell) for any errors in the amount of the payment.

91.     In their agreements by and among themselves in connection with the BlueCard Program requiring certain BlueCard provisions be included in all local in-network provider agreements, each BCBSA Member Company, including Defendant, manifested to Empire its intention that Empire act on their behalf, as their agent, and subject to their control, when negotiating and agreeing with Northwell—or any other provider—the terms in the Provider Agreement.

92.    Empire manifested its consent to act on behalf of Defendant and the Other Member Companies by, among other things, (i) insisting on including the BlueCard terms that are consistent with the requirements of the Member Company agreements in granting the BlueCard Plans access to Northwell's in-network services, rates, and terms and (ii) agreeing that Northwell and the BlueCard Plans were bound by the Provider Agreement.

93.    The Member Companies, including Defendant, have the ability and power to control the substance of the BlueCard terms that Empire included in the Provider Agreement.

94.    The Member Companies had the ability to create and require a set of uniform BlueCard terms but, upon information and belief, instead chose to rely on the local Member Company to negotiate BlueCard terms on behalf of the other Member Companies because they believed that each local Member Company had the best leverage to negotiate the most favorable terms for all of the Member Companies.

95.    The Member Companies could have created and imposed requirements that a local Member Company include all Member Companies in the negotiation of the BlueCard terms in provider agreements or arrange for all Member Companies to sign the respective provider agreements negotiated by the local Member Company.

96.    Upon information and belief, the Member Companies chose not to create or impose any such requirements because doing so would give rise to substantial administrative burdens and costs.

97.    Upon information and belief, each Member Company was comfortable relying on its local counterpart to negotiate those BlueCard terms on their behalf, particularly because it is a reciprocal obligation among all of the Member Companies.

98.     Upon information and belief, each Member Company was also comfortable relying upon its local counterpart to negotiate the BlueCard terms and all other terms of provider agreements with their local healthcare providers because they believed the local Member Company had a stronger bargaining position with the local healthcare provider than the out-of-state Member Companies would have with the provider.

99.     Each Member Company had no choice but to rely upon its local counterpart to negotiate the BlueCard terms and all other terms of provider agreements with their local healthcare providers because they entered into agreements prohibiting each Member Company from negotiating in-network provider agreements with healthcare providers in the exclusive geo-region of other Member Companies.

100.    Failure to have allowed its counterpart to negotiate the BlueCard terms on its behalf or to comply with the terms of the negotiated provider agreements would have resulted in Defendant's plans being "out-of-network" with their sister Member Company's local healthcare providers, such as Northwell, which would have made Defendant in violation of the requirements of BCBSA membership and their representations to their insureds that their plans provided nationwide in-network coverage.

101.    Upon information and belief, any Member Company, including Defendant, could have requested that Empire show it the BlueCard terms in the Provider Agreement.

102.    If Defendant found any BlueCard terms were unacceptable or contrary to the BlueCard Program rules and objectives, Defendant could have demanded Empire change the terms or demand that Empire have them excluded from the Provider Agreement

18

103.    If Empire refused such a demand, Defendant's CEO, as a member of the BCBSA Board of Directors could have pursued the issue with the other BCBSA Board of Directors and together they all had the authority and power to modify the terms of the BlueCard Program.

104.    Upon information and belief, either (i) Defendant chose to not exercise its power to review the BlueCard terms that Empire included in the Provider Agreement because Defendant was comfortable relying on whatever BlueCard terms Empire negotiated on their behalf, or (ii) if Defendant requested and saw the BlueCard terms, Defendant never informed Empire that any such terms were unacceptable, never directed Empire to change the BlueCard terms in the Provider Agreement, and never raised any objections to the other BCBSA Board of Directors regarding the BlueCard terms; thus, manifesting its assent to Empire's actions, on Defendant's behalf, to include the BlueCard terms in the Provider Agreement.

**The Healthcare Claims At Issue**

105.    Pursuant to the Provider Agreement, at the direction of Empire and Defendant, and consistent with the agreements the Member Companies have reached with each other in connection with the BlueCard Program, Northwell timely submitted to Empire separate statements of its billed charges for the medically necessary healthcare Northwell provided to each of the Patients. Northwell's billed charges for the healthcare services provided to the Patients totals $2,299,454.78.

106.    Pursuant to the BlueCard Payment Process, Empire submitted to Defendant, in a standard claim format, the claims at issue that upon information and belief were or should have been "repriced" at the appropriate in-network rates in accordance with the terms of the Provider Agreement.

107.    Pursuant to the BlueCard Payment Process, Provider Agreement, and information provided by Empire, Defendant then made claim determinations regarding coverage and patient cost-sharing obligations. In doing so, Defendant controlled the timing and amount of payment transferred by Empire to Northwell on Defendant's behalf for the claims at issue.

108.    Pursuant to terms and obligations that the Member Companies imposed upon themselves, Defendant was obligated to make the claim determinations and was obligated to do so in accordance with all of the terms in the Provider Agreement.

109.    The Provider Agreement includes numerous restrictions on the grounds that Defendant may use to deny a claim, in whole or in part.

110.    Defendant controlled the claims determinations and after they were transmitted to Empire, Empire did not have any power to alter or change the claim determinations.

111.    Based upon the claim determinations received from Defendant, Empire sent Northwell explanations of payment or remittance advice with information provided by the Defendant. Defendant controlled the subject of these explanations of payment or remittance advice and Empire did not have the power to alter the substance of what was transmitted after being given its direction from Defendant.

112.    When Defendant directed Empire to make a payment, whether or not it was for the correct amount, Empire transmitted to Northwell payment for the claim(s) with funds Empire received, or near simultaneously received, from Defendant for Defendant's designated purpose of paying Northwell on behalf of Defendant.

113.    Pursuant to the definition in the Provider Agreement, Defendant is the Payer, and as such, is the Member Company that is bound by all of the terms of the Provider Agreement

including but not limited to the obligation to pay the amount due to Northwell for treating patients insured by Defendant.

114.    Upon information and belief, pursuant to its healthcare policies, Defendant is obligated to pay either the insured or the provider for covered services rendered to its insureds. However, these policies do not create an obligation to pay Northwell's in-network rates.  That obligated is derived solely from the Provider Agreement.

115.    Further, the Provider Agreement specifically states that Empire is not the Payer of claims for healthcare services provided to patients insured by non-Empire plans such as the Patients, who are insured under Defendant's BlueCard plans.

116.    Consistent with the allegations in paragraphs 85-90, Empire only transfers payment to Northwell for services rendered to Defendant's insureds subject to Defendant's control.

117.    Similarly, Empire delivers to Northwell explanations of payment or remittance advice for the healthcare services provided to the Patients subject to Defendant's control. These explanations of payments or remittance advice set forth the method, timing, and place to submit any appeal of Defendant's claim determinations.

118.    Northwell appealed Defendant's claim determinations for the claims at issue herein.

119.    In taking those appeals, Northwell followed the directions provided by Empire as to how, when, and to whom Northwell should file such appeals.

120.    Northwell engaged in communications with Defendant regarding its appeals and requests for reconsideration of Defendant's claim determinations.

121.    Although communications and transfer of documentation was facilitated by Empire, Defendant was the sole entity reviewing and making appeals determinations.

122.    Since at least 2000, when Northwell renders healthcare services to Defendant's insureds, Defendant has regularly processed and paid claims and participated in appeals pursuant to the aforementioned process, including numerous claims for services during the relevant period wherein Defendant paid the proper in-network rate.

123.    However, for the Claims at issue herein, despite Northwell complying with its obligations under the Provider Agreement, including to properly appeal Defendant's claim determinations, Defendant failed to meet its obligations related to appeals and did one or more of the following: (i) did not make a determination on the appeal; (ii) failed to determine the appeal within the time period set forth in the Provider Agreement; (iii) improperly denied the appeal; or (iv) refused to accept the appeal without cause to do so under the Provider Agreement.

124.    As a result of Defendant's failure to meet its obligations related to appeals, pursuant to the Provider Agreement, Defendant is obligated to make full payment of the in-network rates for the claims at issue.

125.    Northwell complied with all terms in the Provider Agreement that sets forth any requirement that Northwell exhaust any specified appeal process prior to commencing litigation.

126.    In connection with the agreements Empire, Defendant, and the other Member Companies reached regarding the BlueCard Program and the claims and appeals processes, and through their course of conduct in repeatedly determining and paying Northwell's claims for treating patients insured by Defendant as well as making appeals determinations and directing Empire as to what to communicate to Northwell regarding Defendant's appeal determination, (i) Defendant manifested to Empire its intention that Empire act on Defendant's behalf, as

Defendant's agent, and subject to Defendant's control, in the claims determination, claims payment, and appeals processes in the manner described above, and (ii) Empire manifested its consent to Defendant that it would act on Defendant's behalf, as Defendant's agent, and subject to Defendants control, in the claim determination, claims payment process and the appeal process in the manner described above.

127.    Through the agreements among Empire, Defendant, and the other Member Companies regarding the BlueCard Program and the BlueCard Payment Process, and through their course of conduct in repeatedly determining and paying Northwell's claims for treating patients insured by Defendant, both Defendant and Empire exhibited their mutual understanding that Defendant always had the power to control Empire in the claims determination and appeal processes.

128.    For example, Defendant exhibited control by: (i) making the final determination of the amount paid to Northwell, which Empire could not change; (ii) Empire being unable to make payment to Northwell for treating a patient insured by Defendant without Defendant's express authorization and direction; and (iii) reimbursing Empire for payments made to Northwell on Defendant's behalf following Defendant's express direction.

129.    After accounting for the amount of Northwell's claims for billed charges of $2,299,454.78 for the healthcare services provided to the Patients and adjusting those billed charges consistent with the in-network rates in the Provider Agreement, and then subtracting the payments that Northwell has received on account of such claims and patient responsibility, the amount still due and outstanding to Northwell is no less than $244,614.21 plus interest.

130. The Provider Agreement contains a forum selection clause which requires that any action brought pursuant to the Provider Agreement be brought and tried in a court of competent jurisdiction in New York, which is binding on Defendant.

131. In addition, even if Defendant is not bound by the Provider Agreement terms, it is still bound by the forum selection clause because it benefitted from the performance of the Provider Agreement in receiving the discounted in-network rates and favorable terms.

132. Moreover, the close relationship between Empire and Defendant related to the terms and inclusion of the BlueCard terms.

133. Each Patient treated by Northwell presented to Northwell the ID cards which were issued for the purpose of assuring Northwell that Defendant was responsible to pay for healthcare services provided in New York, and Northwell was thereby induced by Defendant to provide such care in New York. Where applicable, Defendant also provided Northwell with prior authorization for the services provided to the Patients.

134. Defendant provides its insureds with resources to locate, contact and shop for healthcare providers from New York, including Northwell, who have agreed with a New York BlueCard insurer (here, Empire) to provide Defendant with access to the New York in-network rates.

135. Defendant was aware its insureds would seek and receive healthcare services in New York.

136. Defendant was also aware that many of the Patients are (or during the relevant time period were) New York residents and that other individuals it insures through its BlueCard Plans are (or were) New York residents.

137. Defendant insured and continues to insure New York residents under its BlueCard Plans, accepted and continues to accept premium payments from those New York residents, and sent and continues to send policy documents, insurance cards, EOBs, and other related communications to those New York residents' at their New York addresses.

138. Defendant and/or its agent and/or affiliate authorized the medical services at issue that were rendered to the Patients by Northwell in New York.

139. Empire, in its capacity as an agent for Defendant, took action in New York on behalf of Defendant and all other BCBSA Member Companies by (i) negotiating the terms and rates in the Provider Agreement which are more favorable than Defendant or the other Member Companies could have obtained on their own; (ii) negotiating the BlueCard terms in the Provider Agreement which, *inter alia*, gave the Defendant access to Northwell's in-network provider rates and terms and (iii) insisting those BlueCard terms be in the Provider Agreement.

140. Empire, also in its capacity as an agent for Defendant, took action in New York on behalf of Defendant and all other BCBSA Members by (i) assisting in facilitating the processing of Northwell healthcare claims, including the transmission of such claims to Defendant, the delivery of Defendant's claim determination notices to Northwell, and the facilitation of the appeals process and (ii) assisting Defendant in facilitating payments due from Defendant to Northwell.

141. During the relevant period, Defendant insured patients who received healthcare services from Northwell and other New York providers in New York; issued policies that provided coverage to New York residents; and marketed insurance plans that Defendant knew would provide coverage in the State of New York.

142.    All of Northwell's healthcare claims that are the subject of the dispute in this action are directly related to and arise from Defendant's contacts with New York.

**AS AND FOR A FIRST CAUSE OF ACTION**
**<u>AGAINST DEFENDANT</u>**
**(Breach of Contract)**

143.    Northwell incorporates and re-alleges the previous paragraphs 1 through 142, as if fully set out herein.

144.    Pursuant to the BlueCard terms included in the Provider Agreement, Empire, on its own and as agent for all Member Companies, including Defendant, agreed that Northwell is obligated to provide in-network healthcare services to patients insured under other Member Companies' BlueCard plans, including to the Patients who are insured under Defendant's BlueCard Plans.

145.    Empire, on its own behalf and on behalf of the other Member Companies, including Defendant, also agreed that Defendant, as a defined "Payer" under the Provider Agreement, was required to pay for Northwell's services provided to Patients the in-network rates in the Provider Agreement and that Defendant was "bound by … all the other applicable terms of the Provider Agreement."

146.    These BlueCard terms in the Provider Agreement both (i) extend to Defendant the valuable contractual benefit of access to Northwell's in-network services, rates, and terms and (ii) impose on Defendant a corresponding contractual obligation to pay Northwell those in-network rates subject to all other applicable terms in the Provider Agreement.

147.    Those terms are consistent with, and conform to, the obligations agreed upon by Defendant and the Other Member Companies in agreements related to the BlueCard Program.

148.    Those terms are also consistent with provisions in the Licensee Agreements with the BCBSA that both Empire and Defendant were required to participate in the BlueCard Program and to abide by Member Standards requiring in substance (i) that they each include in their agreements with in-network providers contractual terms requiring the in-network provider to treat patients insured under any other BCBSA Member Company's BlueCard plan, and (ii) that they each provide the financial resources needed to pay for the healthcare that any of their respective patients received from a provider who had an in-network agreement with a BlueCard Plan insurance plan in another state.

149.    The Provider Agreement states that Defendant, as a "Payer," is "bound by the applicable rates and all other applicable terms of this [Provider] Agreement." This is consistent with the Member Companies' statement on their BCBSA website that the BlueCard Program is intended to create interlocking relationships, *i.e.* "links," between the Member Companies and the participating (in-network) providers of each of those Member Companies.

150.    Defendant and Empire both participated in the claims determination process, with Defendant having final say and control over whether or not claims were paid and with Empire only being able to act following express instruction and authorization from Defendant.

151.    Defendant's conduct demonstrated the connection between Defendant's BlueCard Plans and Northwell when (i) Defendant received from its claim processing agent, Empire, the charges billed by Northwell for treating the Patients; (ii) Defendant determined Northwell's claims relying on and willingly invoking Northwell's in-network rates, which was only possible through the terms in the Provider Agreement; (iii) Defendant made coverage and eligibility determinations with respect to Northwell's services, and delivered those determinations to Empire who in turn passed on Defendant's determinations to Northwell via explanations of

27

benefits or payments; (iv) Defendant agreed to pay the in-network rates, which right to such rates existed only under the terms of the Provider Agreement; (v) Defendant authorized and directed its claim processing agent to pay to Northwell an amount that Defendant specified, and Defendant near simultaneously provided Empire funds for the sole purpose of paying Northwell the specified amount; and (vi) Defendant controlled the appeals determination process and utilized Empire as its go-between for communications with Northwell regarding its appeals determinations.

152.    Empire and Northwell offered to give Defendant, and all other Member Companies, access to Northwell's in-network services, rates, and terms in the Provider Agreement, and Defendant authorized, and required, Empire to accept that offer on its behalf.

153.    In exchange, Empire, on behalf of Defendant and the other Member Companies, offered to Northwell Defendant's, and the other Member Companies', contractual promise that they were bound to pay Northwell for treating their insureds at Northwell's in-network rates pursuant to the terms of the Provider Agreement.

154.    Northwell accepted that offer.

155.    This exchange of contractually promised benefits and obligations by Northwell and Defendant constitutes fair consideration.

156.    The interactions and arrangements between Empire and Defendant, and among Northwell, Defendant, and Empire under the Provider Agreement, demonstrate close relationship between Northwell and Defendant with respect to healthcare services provided to patients insured under Defendant's BlueCard plans, including to each of the Patients, under the terms of the Provider Agreement.

157.    Defendant always has understood, as demonstrated by its conduct, that it was the "Payer" who is responsible to pay Northwell, pursuant to all the terms of the Provider Agreement, for the healthcare provided to the Patients.

158.    Upon information and belief, Defendant's benefit plans require Defendant to pay the provider of medical services to its insureds (or the insured directly) for covered services. However, Defendant's right to pay in-network rates for services rendered by Northwell to Defendant's insureds arises solely under the BlueCard terms in the Provider Agreement.

159.    Northwell has always understood, based on the terms of the Provider Agreement and the conduct of Defendant and Empire, that the Provider Agreement encompassed Defendant as a party to that contract to the extent Northwell provided healthcare services to patients insured under Defendant's BlueCard plans, including to the Patients.  Empire has never advised Northwell otherwise and prior to this lawsuit, Defendant also had never done so. To the contrary, Defendant's course of conduct in paying claims and complying with the terms of the Provider Agreement, with the exception of the claims at issue in this action, has communicated to Northwell that they agree they are bound by the Provider Agreement.

160.    The joint activity of Defendant and Empire with respect to Northwell's provision of healthcare services to patients insured under Defendant's BlueCard plans, including to each of the Patients, and with respect to the determination and payment of Northwell's claims for those services, manifests a mutual intention by Defendant and Empire that Defendant was the party bound by the Provider Agreement to pay for such healthcare services, despite Empire never having required Defendant to sign the Provider Agreement.

161.    Defendant's repeated acceptance of the Northwell's in-network rates and terms, which are only available to it through the Provider Agreement, and the numerous occasions on

which Defendant paid Northwell, or provided funds to its claim processing agent with direction to pay Northwell with funds earmarked specifically for that purpose, in accordance with the terms of the Provider Agreement, constitutes an assumption and adoption by Defendant of the BlueCard terms in the Provider Agreement requiring Defendant pay Northwell in accordance with the terms of the Provider Agreement.

162. Empire negotiated and agreed to the terms in the Provider Agreement, including the BlueCard terms, on behalf of itself, Defendant and the other Member Companies.

163. Defendant (i) gave Empire authority to act on its behalf in this regard through agreements reached among the Member Companies in connection with the BlueCard Program, including those requiring Empire include in its local in-network provider agreements terms that grant the Member Companies' insureds access to that provider's in-network services and rates; and (ii) manifested to Empire, through those agreements and Defendant's many years of adhering to the BlueCard terms in the Provider Agreement, that Empire was authorized to act on Defendant's behalf in this regard.

164. Empire separately and continuously manifested to Defendant its intention to act on behalf of Defendant, by (i) negotiating the Provider Agreement on behalf of Defendant to include the BlueCard terms granting Defendant access to the Provider Agreement's in-network services, terms, and rates and (ii) through many years of conduct, acting on behalf and at the behest of Defendant in the claims and appeals determination processes and the BlueCard Payment Process.

165. Defendant also manifested to Northwell, through its many years of conduct, that Empire was and is authorized to act on Defendant's behalf in negotiating the Provider

Agreement (and its amendments) and in facilitating the claims determination process, BlueCard Payment Process, and appeals determination process.

166.    As set forth *supra*, Defendant possessed control over Empire with respect to: (i) Empire including the BlueCard terms in the Provider Agreement (¶¶ 37, 45, 84-86, 91); (ii) whether payment was made, and if so, in what amount to Northwell for services rendered to Defendant's insureds (¶¶ 57-58, 76-77, 96, 99-101, 105, 116, 137-138); and (iii) in appeals determinations for claims for Defendant's insureds (¶¶ 110-111, 138).

167.    At all times, including prior to signing the 2008 Amendment, Northwell knew that Defendant was repeatedly directing and authorizing Empire to pay Northwell, on Defendant's behalf and with funds provided by Defendant, specified amounts that Defendant and Northwell knew were calculated by Empire based on Northwell's in-network rates and other terms in Northwell's provider agreement with Empire.

168.    Northwell's awareness of Defendant's conduct prior to the 2008 Amendment created the appearance and reasonable belief by Northwell that Empire possessed authority both (i) to negotiate, on behalf of Defendant, the BlueCard terms in the 2008 Amendment and (ii) to bind Defendant to those BlueCard terms.

169.    After the 2008 Amendment was executed, Defendant ratified the BlueCard terms in the Provider Agreement by knowingly paying Northwell amounts that Defendant knew Empire had calculated at Northwell's in-network rates set forth in the Provider Agreement.

170.    Defendant knew, and Northwell reasonably understood Defendant was aware that, Defendant's access to those contractual in-network rates was only available to Defendant if Empire, on behalf of Defendant, included BlueCard terms in the Provider Agreement.

31

171.   Defendant also made payments at the in-network rates for Northwell claims knowing that the discounted Northwell in-network rates were only available to Defendant through the Provider Agreement and that Defendant was contractually bound to pay Northwell those in-network rates.

172.   Defendant possessed such knowledge independently of whether or not it ever saw or even asked to see the Provider Agreement.

173.   Upon information and belief, Defendant paid Northwell claims after the 2008 Amendment at Northwell's in-network rates in the Provider Agreement without asking to see the BlueCard terms that Empire included in the Provider Agreement on its behalf.

174.   Northwell was repeatedly presented with ID cards that Defendant intended to convey the message to Northwell that Defendant would pay Northwell for treating Defendant's insureds in accordance with terms in the Provider Agreement.

175.   Where necessary, following review of the ID cards, Northwell contacted Defendant, per the method prescribed on the ID cards, to obtain pre-authorization for the healthcare services rendered to the Patients.

176.   Northwell timely submitted to Empire, and therefore to Defendant as well, the billed charges for the healthcare services provided to each of the Patients. Northwell submitted such billed charges in the manner prescribed by Empire.

177.   Empire then transmitted the claims to Defendant for Defendant to make claims determinations.

178.   When determining Northwell's claims Defendant is required under the BCBSA standards, and the BlueCard terms in the Provider Agreement, to determine those claims in accordance with the terms of the Provider Agreement.

179.    The Provider Agreement includes numerous provisions which limit the grounds on which Defendant may deny, in whole or in part, a claim by Northwell for healthcare services provided to the Patients.

180.    In determining Northwell's claims and appeals, Defendant failed to adhere to one or more of the terms in the Provider Agreement.

181.    Defendant improperly, and without grounds to do so, determined no payment or only a partial payment was due to Northwell for the healthcare services provided to the Patients.

182.    As a result, Northwell has not received the in-network contracted rates in accordance with the terms of the Provider Agreement despite: (i) Northwell provided medically necessary healthcare to the Patients; (ii) Defendant's obligations under the BlueCard program to provide insurance coverage for those services; and (iii) Defendant's obligations to pay for the services rendered to the Patients subject to all the terms of the Provider Agreement.

183.    Defendant's failure to properly pay for healthcare claims owed to Northwell in accordance with the terms of the Provider Agreement constitutes a breach of Defendant's contractual obligations to Northwell arising under the BlueCard Program; the BlueCard standards set forth in the License Agreement with Defendant and Empire; and BlueCard terms that the Empire was required to include in the Provider Agreement pursuant to the Member Companies' agreement regarding that BlueCard Program.

184.    As a direct and proximate result of the Defendant's breaches of its contractual obligations owed to Northwell, Defendant has injured Northwell and caused Northwell to sustain damages in an amount to be determined at trial, but which is no less than $244,614.21 plus interest.

**AS AND FOR A SECOND CAUSE OF ACTION**
**AGAINST DEFENDANT**
**(Breach of Third-Party Beneficiary Contract)**

185.    Northwell incorporates and re-alleges the previous paragraphs 1 through 184, as if fully set out herein.

186.    The Member Standards, Member Guidelines, and the Members' Agreed Rules created by the Member Companies sets forth agreements between and among the Member Companies to govern their interactions in connection with the BlueCard Program.

187.    The Member Companies have sought to keep confidential their various agreements among themselves and go to great lengths to avoid public disclosure of those agreements.  Nevertheless, some of those agreements, or portions thereof, have been publicly disclosed.

188.    These agreements create obligations not only between and among the Member Companies but also that run from individual Member Companies, such as Defendant, to the in-network providers of other Member Companies, who provide medical services to patients insured by that individual Member Company (here, Northwell).

189.    Publicly available documents show that, in connection with the BlueCard Program, Empire and Defendant, as well as the other Member Companies, have agreed by and among themselves that Empire is authorized and required by Defendant, and the other Member Companies, to include in Empire's agreements with Northwell contract terms requiring Northwell to treat patients insured by Defendant's BlueCard Plans.

190.    Publicly available documents show that Empire and Defendant, as well as the other Member Companies, have agreed by and among themselves that when an in-network provider of Empire, such as Northwell, treats a patient in Empire's Service Area who is insured

by a plan issued or administered by Defendant, then Defendant will reimburse Northwell for treating that patient the rates and pursuant to the other terms negotiated by Empire in the Provider Agreement.

191.    Publicly available information reflects that Empire and Defendant agreed exactly how they would effectively and efficiently pay or reimburse Northwell for treating their insureds when they are the Home Plan, i.e. the BlueCard Payment Process. Empire, Defendant and the other Member Companies agreed in rules they adopted, and approved, regarding the BlueCard Payment Process that it would be administered via an agreement with by an entity referred to as the Central Finance Agency ("CFA"). The process ensures that after the payment Defendant pre-authorized was transmitted by Empire to Northwell, Empire submits a request to the CFA for reimbursement from Defendant and so long as Defendant did not object to the payment they already authorized, within three days, the CFA would transfer from Defendant's bank account to Empire's bank account the funds. Empire, Defendant and the CFA's account entries regarding this activity reflect that any amount paid to Northwell and reimbursed by Defendant was always regarded as an obligation of Defendant and Empire's role was always ministerial.

192.    Upon information and belief, based in part on Defendant's agreement to pay, and history of paying,  Northwell's claims at the in-network rates set forth in the Provider Agreement, and in part on Northwell's own evolving institutional knowledge regarding the BlueCard Program over the last twenty-four years, including the actions and representations of Empire and Defendant throughout those twenty-four years, Empire and Defendant, and the other Member Companies have agreed that they are obligated to work with each other to correct any underpayment of any claim by Northwell, and Defendant bears the liability to any third party, such as Northwell, for any loss from a claim error for claims for services rendered to its insureds.

35

193.    Upon information and belief, Defendant has not made any effort to correct, or even consider correcting, the alleged non-payments and underpayments of Northwell's claims for treating the Patients.

194.    Northwell is an intended third-party beneficiary of the agreements between and among Empire, Defendant and the other Member Companies in connection with the BlueCard Program, including but not limited to the Membership Standards, the Membership Guidelines, and the Members' Agreed Rules because, in each instance in which Northwell submitted a claim for treating a patient covered under one of Defendant's Home Plans, (i) Empire and Defendant were both aware that Northwell was contractually bound to treat those patients, (ii) Empire and Defendant had agreed that Defendant was responsible to reimburse Northwell for those claims; (iii) Empire and Defendant had agreed to the precise rate at which to pay Northwell for its services; *i.e.*, at the in-network rates set forth in the Provider Agreement, less the patient's cost-sharing obligation; (iv) Empire and Defendant had agreed to the process by which they would pay Northwell; *i.e.*, the BlueCard Payment Process; and (v) Defendant knew (a) it was responsible to correct any claim errors, (b) that it is liable to any third party as a result of any such error, and (c) that no one other than Northwell has any interest in having the errors for the claims for the Patients corrected.

195.    As set forth *supra*, Defendant participated in the claim determination process, the BlueCard Payment Process, and the appeal determination process with respect to Northwell's claims for treating the Patients.

196.    For each claim at issue in this action, Defendant made errors in the determination and payment of the amount due on the claim.

197. Defendant's failure to correct those errors is a violation of the agreements by and among the Member Companies.

198. As a result of Defendant's claim errors and failure to correct the claim determination and payment errors, Northwell was not paid the correct amount due for the claims at issue herein.

199. Defendant failed to properly determine Northwell's claims for healthcare services provided to the Patients in accordance with the terms of Defendant's agreements with Empire requiring that the amount of Defendant's payment to Northwell be determined pursuant to the rates and other terms of the Provider Agreement.

200. Defendant failed to pay Northwell the amount due under those contractual terms.

201. Defendant's failure to approve, authorize, and reimburse payment to Northwell in the proper amount due at the rates in its Provider Agreement constitutes a breach by Defendant of its contractual obligations under the Member Standards, Member Guidelines, and the Members' Agreed Rules.

202. As a direct and proximate result of the Defendant's breaches of those contractual obligations that were intended to benefit Northwell, Defendant has injured Northwell and caused Northwell to sustain damages in an amount to be determined at trial, but which is no less than $244,614.21 plus interest.

**AS AND FOR A THIRD CAUSE OF ACTION**
**AGAINST DEFENDANT**
**(Breach of Third-Party Beneficiary Contract)**

203. Northwell incorporates and re-alleges the previous paragraphs 1 through 202, as if fully set out herein.

204.    Empire included in the Provider Agreement terms that gave Defendant the same access as Empire to Northwell's in-network services, rates, and terms. Empire did so because it had separately agreed with Defendant and the other Member Companies to ensure that they all had access to the same in-network services, rates, and terms in Empire's in-network provider agreements.

205.    By including such language, Empire sought to effect a partial assignment to Defendant, and the other Member Companies, of Empire's right to the in-network services, rates, and terms of the Provider Agreement.

206.    Northwell's execution of the Provider Agreement exhibits its acceptance of Empire's partial assignment to Defendant and the other Member Companies.

207.    Defendant accepted the partial assignment both (i) when it agreed to the Members' Agreed Rules authorizing and requiring Empire to include terms in its Provider Agreement that obligated Northwell to treat patients insured under Home Plans issued or administered by Defendant; (ii) when it published to its insureds that Northwell is an in-network provider under its plans and (iii) when for claims for its insureds that are not subject to this action, it repeatedly and knowingly paid Northwell for treating its insureds at the reduced in-network rates subject to the terms of the Provider Agreement.

208.    Relatedly, Empire also agreed with Defendant and the other Member Companies that when an Empire in-network provider treats a patient covered under a Plan issued or administered by Defendant, or any other Member Company, then the "Home Plan" (Defendant) "will reimburse the provider" (Northwell) at a rate which equals the levels received under the local in-network provider agreement.

209.    Pursuant to its agreements with Defendant and the other Member Companies, Empire included in the Provider Agreement terms stating that Defendant, as the entity that insures the Patients in this action, is required to reimburse Northwell at a rate that equals the levels received under the Provider Agreement. By imposing those payment terms on Defendant, Empire sought to effect a partial delegation to Defendant of the obligation to pay Northwell whenever Northwell treats a patient insured under Defendant's BlueCard Plans.

210.    Northwell's execution of the Provider Agreement exhibits its acceptance of this partial delegation to Defendant of Empire's duties to pay Northwell when it treats patients covered under Defendant's BlueCard Plans.

211.    Defendant accepted Empire's partial delegation of its contractual obligation to pay Northwell when Defendant agreed with and among Empire and the other Member Companies that it would reimburse Empire's contacted provider (Northwell) at the rates and in the amount due under the terms of the Provider Agreement. Defendant also manifested its acceptance of Empire's partial delegation of its obligation to pay Northwell by (i) informing its insureds that Northwell was an in-network provider, and (ii) by repeatedly and knowingly approving, authorizing, and reimbursing Empire payments to Northwell at Northwell's in-network rates for treating such patients insured by BlueCard Plans for over the course of numerous years for claims not subject to this action..

212.    In the Provider Agreement, Northwell is the obligor with respect to the rights Empire partially assigned to Defendant to access Northwell's in-network services, rates, and terms. As such, Northwell is a third party-beneficiary of Defendant's acceptance of Empire's partial delegation of the obligation to pay for access to Northwell's in-network services, rates, and terms.

213.    Northwell is the lone, specifically identifiable, third-party beneficiary of Defendant's agreement with Empire to accept both Empire's partial assignment of access to Northwell's in-network services, rates, and terms and Empire's delegation of the contractual obligation to pay Northwell pursuant to the Provider Agreement when it treats a patient insured under a plan issued or administered by Defendant.

214.    Defendant and Empire were both aware that if Defendant did not approve and pay the claims at the correct, in-network rate, Northwell would not be paid the correct amount under the Provider Agreement and that Northwell is the only entity with an interest in Northwell being paid the correct amount under the Provider Agreement.

215.    Defendant failed to properly determine Northwell's claims for healthcare services provided to the Patients in accordance with the terms of Defendant's agreements with Empire requiring that the amount of Defendant's payment to Northwell be determined under the rates and other terms of the Provider Agreement.

216.    Defendant failed to pay Northwell the amount due under those contractual terms.

217.    Defendant's failure to approve, authorize, and reimburse payment to Northwell in the proper amount due under the rates and terms in its Provider Agreement constitutes a breach by Defendant of its contractual obligations arising under its agreements with Empire to accept Empire's partial assignment of its in-network access rights under Empire's Provider Agreement with Northwell and Empire's delegation to Defendant of Empire's obligation to pay Northwell the amount due under the rates and terms of the Provider Agreement whenever Northwell treats a patient insured under a BlueCard Plan issued or administered by Defendant,

218.    As a direct and proximate result of Defendant's breaches of those contractual obligations that were intended to benefit Northwell, Defendant has injured Northwell and caused

Northwell to sustain damages in an amount to be determined at trial, but which is no less than $244,614.21 plus interest.

## AS AND FOR A FOURTH CAUSE OF ACTION
## AGAINST DEFENDANT
### (Quasi-Contract )

219.    Northwell re-alleges the allegations set forth in paragraphs 1 through 5, 7 through 122, and 132-138 as if fully set forth at length herein.

220.    Northwell pleads in the alternative that, in the event the Defendant asserts, or fails to admit otherwise, that Defendant is not bound by a contract to compensate Northwell for the healthcare services Northwell provided to the Patients, then the Defendant is liable in such alternative to pay Northwell the reasonable value of such healthcare services under the quasi-contract grounds of unjust enrichment and quantum meruit.

221.    Northwell's charges for the health care services provided to the Patients are divided into two groups (1) charges for emergency services; and (2) charges for non-emergency services.  With respect to each group, Northwell was compelled to provide such services to the Patients, and Defendant would be unjustly enriched if not compelled to pay for such services.

**Compulsion to Provide Emergency Services**

222.    A substantial number of the Patients presented at a Northwell emergency room.

223.    Under both federal and state law, Northwell and its physicians have a duty, and are obligated and compelled, to treat all patients that arrive at a Northwell emergency room, even when a patient is not insured.

224.    For example, under the federal Emergency Medical Treatment and Labor Act ("EMTALA"), 42 U.S.C. §§ 1395dd(a)-(b), (d), and (h), hospitals and physicians who staff hospital emergency rooms have a duty to "provide for an appropriate medical screening

examination" when an individual comes to the emergency department.  If "the individual has an emergency medical condition," they are required to "stabilize the medical condition" without inquiry into "the individual's method of payment or insurance status." Id.

225.   Hospitals are subject to civil liability for a violation of EMTALA's mandates, 42 U.S.C. § 1395dd(d)(2)(A), and "any physician who is responsible for the examination, treatment, or transfer of an individual in a participating hospital" who negligently violates EMTALA is subject to civil monetary penalties of up to $50,000 per violation. 42 U.S.C. § 1395dd(d)(1)(B).

226.   Under New York law, hospitals and physicians likewise have a duty to admit and treat "any person who is need of immediate hospitalization" and to "provide emergency medical care and treatment to all persons in need of such care and treatment who arrive at the entrance" of the hospital.  A hospital which violates these duties is subject to a misdemeanor criminal charge, and the hospital's physicians who violate these duties are subject to a term of imprisonment not to exceed one year and affine not to exceed $1,000.  New York Public Health Law § 2805-b.

227.   In the event Defendant asserts that neither the terms of the Provider Agreement nor the terms of Defendant's agreement with the BCBSA, impose on Defendant any contractual obligation to pay Northwell at Northwell's in-network rates for the emergency health care services provided to the Patients, then, in the alternative, Northwell provided the emergency care to the Patients on an out-of-network basis—meaning Northwell and Defendant did not have a written agreement establishing a rate of payment for the care provided.

228.   In such circumstances, Northwell is dependent on Defendant to conduct business honestly and pay Northwell the reasonable value of the emergency care provided to Defendant's insured Members as required under federal and New York law.

**Compulsion to Provide Non-Emergency Services**

229.    Northwell also had a duty, and was compelled, to provide healthcare services to the Patients who required non-emergency services. That duty, and compulsion, arose under the Provider Agreement with Empire which required Northwell to treat patients who were insured under a BlueCard plan of any of the BCSA Member companies.  Defendant was aware that Northwell had this duty, and was under this compulsion, to treat those Patients who presented an insurance card issued under any of Defendant's BlueCard plans.  By its words and/or conduct, Defendant and/or their agents requested that Northwell provide the Patients, Defendant's members or insured, with medically necessary care.

230.    In the event Defendant asserts, and the Court finds, that neither the terms of the Provider Agreement nor the terms of Defendant's license agreement with the BCBSA, impose on Defendant any contractual obligation to pay Northwell, at Northwell's in-network rates, for the non-emergency health care services Northwell provided to the Patients, then, in the alternative, Northwell provided the non-emergency care to the Patients on an out-of-network basis.

231.    In such circumstances, Northwell was dependent on Defendant to conduct business honestly and pay Northwell the reasonable value of the non-emergency care provided to Defendant's insured Members as required under New York law.

**Defendant's failure to pay the reasonable value of Northwell's services.**

232.    After Northwell obtained each Patient's insurance card reflecting that the Patient was insured under a BlueCard plan and identifying Defendant as the BCBSA Member company responsible for paying for the health care Northwell provided to the Patient, Northwell then submitted a claim for its billed charges for the health care provided that Patient.  At the direction

of Empire, Northwell submitted such claims for its billed charges to Empire because Empire stated it would pass the claim to Defendant for payment.

233. Northwell's billed charges for each Patient's care, whether emergent or non-emergent, reflect the reasonable value of the care Northwell provided to the Patients. The amount of the total billed charges for the healthcare services Northwell provided to the Patients is $2,299,454.78.

234. After receiving the claims for Northwell's billed charges for the healthcare services Northwell provided to each of the Patients, Defendant either (i) paid or caused to be paid a portion of those billed charges, or (ii) failed to pay or cause to be paid any portion of those billed charges. The total amount Defendant has paid, or caused to be paid, toward Northwell's billed charges for the healthcare services provided to the Patients or that has been paid by the Patients as part of their cost-sharing obligation is $342,648.2. Therefore, the total amount Defendant has not paid, or not caused to be paid, toward the reasonable value of the healthcare services Northwell provided to the Patients is $1,956,806.58.

235. Given the nature of the relationships set forth above in this Fourth Cause of Action, an equitable obligation arises to account for the benefit provided by Northwell to Defendant.

236. In the absence of such an obligation, Defendant would be enriched unjustly at the expense of Northwell.

237. Defendant's failure to pay Northwell the reasonable value of Northwell's services comes at Northwell's expense because Northwell is entitled to payment at the reasonable value of the services it has rendered.

238. It would be inequitable to permit Defendant to retain the amount at issue. Northwell is entitled to such amounts, which represent the difference between the reasonable value of the services Northwell has rendered and the amounts allowed by Defendant for such services, plus interest at the applicable rate.

239. Defendant's failure to reimburse Northwell for the reasonable value of the emergency and non-emergency care provided to Defendant's insureds benefits the Defendant because it does not pay the valid claims of a healthcare provider of medically necessary care.

240. Furthermore, the healthcare Northwell provided to the Patients conferred a benefit on Defendants by providing valuable emergency and non-emergency medical care to their insureds, for which Defendant was responsible for payment.

241. In exchange for premiums and other forms of compensation, Defendant owes its insureds an obligation to make sure the insureds receive covered medical services and to pay for the covered medical services. By virtue of selling its members access to in-network care provided by Northwell's facilities and providers the Defendant is unjustly enriched to the extent they do not properly pay Northwell the reasonable value for healthcare services Northwell provided to the Defendant's members or insureds.

242. Defendant voluntarily accepted, retained, and enjoyed, and continues to accept, retain, and enjoy, the benefits conferred on it by Northwell, knowing that Northwell expected to be paid the reasonable value of its services.

243. It would be against equity and good conscience to allow Defendant to reap a benefit by underpaying Northwell for valuable emergency and non-emergency medical care provided to Defendant's insureds that Northwell was compelled to render.

244.    Northwell has made demand upon the Defendant for payment of the medical services Northwell provided for the benefit of the Defendant with the expectation that the reasonable value for its services would be paid.  Defendant has failed to pay Northwell the reasonable value of the healthcare services provided to Defendant's insureds.

245.    As a consequence thereof, Defendant has been unjustly enriched, and Northwell has been damaged, by Defendant's retention of the benefits conferred upon it by Northwell, the reasonable value of which is no less than $1,956,806.58 together with interest at the applicable statutory rate.

**WHEREFORE**, Northwell respectfully requests entry of judgment against Defendant as follows:

a.    with respect to the first cause of action, a judgment against Defendant in an amount to be determined at trial, but which is no less than $244,614.21, plus interest at the applicable statutory rate;

b.    with respect to the second cause of action, a judgment against Defendant in an amount to be determined at trial, but which is no less than $244,614.21, plus interest at the applicable statutory rate;

c.    with respect to the third cause of action, a judgment against Defendant in an amount to be determined at trial, but which is no less than $244,614.21, plus interest at the applicable statutory rate;

d.    with respect to the fourth cause of action, a judgment against Defendant in an amount to be determined at trial, but which is no less than $1,956,806.58, plus interest at the applicable statutory rate; and

e.      with respect to all causes of action, awarding Northwell's costs, attorneys' fees,

and any other relief in law or equity that the Court deems appropriate.

DATED:      New York, New York
            March 16, 2026


                                    BUTLER TIBBETTS, LLC


                         By:      _/s/ *Meredith F. McBride*____
                                  Meredith F. McBride, Bar No. MM2783
                                  Timothy F. Butler, Bar No. TB8749
                                  *Attorneys for Plaintiff Northwell Health, Inc.*
                                  Nine East 45th Street, 9th Floor
                                  New York, NY 10017
                                  Telephone: (203) 656-1066
                                  mmcbride@butlertibbetts.com
                                  tbutler@butlertibbetts.com